UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

RICHARD DEVORE                                                                                    PLAINTIFF

v.                                                          CIVIL ACTION NO. 3:19-CV-00731-CRS

UNITED PARCEL SERVICE, INC.                                                            DEFENDANT

## MEMORANDUM OPINION

This matter is before the Court on the motion of Defendant United Parcel Service, Inc. ("UPS") for summary judgment (DN 54) pursuant to Fed. R. Civ. P. 56. Plaintiff Richard DeVore ("DeVore") has responded (DN 62) and UPS replied (DN 65). This matter is now ripe for adjudication.

### I.

DeVore was employed as a Flight Crew Scheduler ("Scheduler") for UPS from April 2000 until May 2018. DN 54-1, PageID# 208-09. As a Scheduler, DeVore was "responsible for the regulatory and contractual compliance of flight schedules for UPS crewmembers," which included "[m]aintaining the legality of all UPS flight crewmembers according to Title 14 of the Code of Federal Regulations (14 CFR) and the UPS/IPA (Independent Pilots Assoc.) contract[.]" Scheduler Job Description, DN 54-2, PageID# 238. In accordance with the UPS/IPA contract ("CBA") that was in effect from 2016 through 2021, if a pilot called "Crew Scheduling" to request an "early release" from his or her "on-call period" and the Scheduler granted the release, the Scheduler was required to input a certain code into the pilot's record so that a deduction would be applied to the pilot's pay. Complaint, DN 1, PageID# 3; UPS/IPA contract, DN 54-5, PageID# 244. All requests

1

for early release were to be granted unless, at the time of the request, UPS had an assignment for the pilot. DN 54-5, PageID# 244. Thus, the Scheduler had no discretion as to whether to grant the early release request or to input the code for the pay deduction. *Id.*; *see* DN 54, PageID# 187 n.3. DeVore testified that he received training on the requirements of the CBA in 2016. DN 54-1, PageID# 216-17.

On May 19, 2018, a UPS pilot called DeVore to request a six-hour early release. DN 54-14, PageID# 286. DeVore granted the release but did not enter in the code necessary for the pilot's pay deduction, thus allowing the pilot to take release while still receiving full pay. *See* DN 1, PageID# 18; DN 54-13, PageID# 282. UPS Supervisor Chris Deignan discovered this incident while searching for an unrelated phone conversation and, on May 23, 2018, reported DeVore's conduct to UPS Manager Jeffrey Johnston ("Johnston"), who then conveyed the information to other members of UPS management. DN 54-15, PageID# 289. Ultimately, DeVore was discharged on May 25, 2018 for falsifying documentation in violation of the UPS employee integrity policy. DN 54-1, PageID# 218-19.

Approximately two months before his discharge, DeVore claims that he called Johnston over to his desk and said, "I'm going to have to go out on surgery," to which Johnston replied, "Okay." DN 62-1, PageID# 140. According to DeVore, there was then some discussion about employee training that might need to be completed before DeVore went out for his surgery. *Id.*, PageID# 140-43. DeVore testified that this was the only conversation that he had with Johnston or any other member of UPS management about his potential medical leave. DN 54-1, PageID# 230, 231.

2

**II.**

In October 2019, DeVore filed a complaint against UPS in federal district court alleging retaliation in violation of the Family and Medical Leave Act ("FMLA"). DN 1, PageID# 5 (citing 29 U.S.C. § 2601). According to DeVore, he "engaged in a protected activity when requesting FMLA leave for his surgery and subsequent recovery" and UPS retaliated against him by terminating his employment. *Id.* UPS has moved for summary judgment. DN 54.[1]

**III.**

Summary judgment is appropriate when the moving party shows that, for each claim or defense on which judgment is sought, there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party may show the absence of any genuine issue of material fact by "demonstrating that the nonmoving party lacks evidence to support an essential element of its case." *Ford v. GMC*, 305 F.3d 545, 551 (6th Cir. 2002). A fact is "material" if its resolution might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that negate an essential element of the nonmoving party's claim. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. 317 at 322.

---

[1] The Court notes that, prior to filing the instant action, DeVore filed for unemployment benefits with the Kentucky Division of Employment Insurance ("KDUI") and his claim was denied because KDUI found that he had "knowingly violated a reasonable and uniformly enforced rule of the employer." *See* Ky. Ct. App. Opinion, DN 54-17. The KDUI decision was upheld on appeal by the Unemployment Appeals Branch and the Kentucky Unemployment Insurance Commission, and upon judicial review by the Jefferson Circuit Court and the Kentucky Court of Appeals. *Id.*

If the moving party makes this showing, "the burden . . . shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. DOT*, 53 F.3d 146, 150 (6th Cir. 1995). The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). Rather, to overcome a motion for summary judgment, the nonmoving party must produce "significant probative evidence." *See Moore*, 8 F.3d 335, 339-40 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The court must view the evidence in the light most favorable to the non-moving party and grant a motion for summary judgment only "if the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party." *Cox*, 53 F.3d 146, 150 (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989)).

## IV.

Under the FMLA, a qualifying employee who is unable to perform his or her job due to a "serious health condition" is entitled to up to twelve weeks of unpaid leave each year. *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (citing 29 U.S.C. § 2612(a)(1)(D)). "An employer . . . violates the FMLA under [a] 'retaliation theory if it takes adverse action against an employee because the employee invokes an FMLA right, rather than for a legitimate, nondiscriminatory reason.'" *Casagrande v. OhioHealth Corp.*, 666 F. App'x 491, 496 (6th Cir. 2016) (citing *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012)). When the plaintiff does not provide direct evidence of retaliation, the *McDonnell Douglas* burden-shifting framework is applied. *Marshall v. Rawlings Co. LLC*, 854 F.3d 368, 381 (6th Cir. 2017).

*McDonnell Douglas* requires a plaintiff to first establish a prima facia case by showing that "(1) he was engaged in a statutorily protected activity; (2) [the employer] knew that he was exercising his FMLA rights; (3) he suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action." *Seeger*, 681 F.3d at 283 (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012)). Once the plaintiff establishes a prima facie case, "the defendant has the burden to articulate a nondiscriminatory reason for the adverse employment action; if the defendant can provide a nondiscriminatory reason, the plaintiff has the burden to show that the reason was pretext." *Marshall*, 854 F.3d at 379. "At the summary judgment stage, [the Court] must determine whether, within the steps of the *McDonnell Douglas* framework, there are genuine disputes of material fact." *Id.* at 381.

A. *Notice of Protected Activity*

The record in the present action does not support the first two prongs of DeVore's prima facie case. While "[a]n employee need not expressly assert rights under the FMLA," the employer must be given "sufficient notice" from which the employer "can reasonably conclude that an FMLA-qualifying circumstance is in play." *Reeder v. Cnty. of Wayne*, 694 F. App'x 1001, 1006 (6th Cir. 2017) (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012)). If an employee meets this burden, "it is incumbent on the employer—if more information is needed to determine whether the condition is FMLA-qualifying—to require, by written notice, certification by a health-care provider." *Id.* at 1006 (citing *Wallace v. FedEx Corp.*, 764 F.3d 571, 587-88 (6th Cir. 2014)). However, "part of reasonable notice generally includes an indication of 'the anticipated timing and duration of the leave.'" *Wallace*, 764 F.3d at 586 (quoting 29 U.S.C. § 825.302(c))). FMLA leave notice must also be "reasonably adequate to apprise the employer of the employee's request to

take leave for a serious health condition that rendered him unable to perform his job.'" *Gipson v. Vought Aircraft Indus., Inc.*, 387 F. App'x 548, 556 (6th Cir. 2010) (quoting *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004) (brackets and emphasis omitted)).

There is no evidence that DeVore directly asserted his FMLA rights or that he provided UPS with any "indication of the anticipated timing and duration of the leave." Simply stating, "I'm going to have to go out on surgery," without any further information or any further discussion, is not only insufficient to show that UPS could "reasonably determine whether the FMLA may apply to the leave request," but is also inadequate to establish that UPS knew "there was any such *request* at all." *See Keogh v. Concentra Health Servs.*, 752 F. App'x 316, 322 (6th Cir. 2018).[2] DeVore's vague statement to Johnston also did not "reasonably inform [UPS] that [DeVore] was presently suffering from" a serious health condition, which the FMLA defines as "'an illness, injury, impairment, or physical or mental condition that involves . . . (A) inpatient care in a hospital, hospice, or residential medical care facility or (B) continuing treatment by a health care provider' as defined in the applicable regulations." *Gipson v. Vought Aircraft Indus., Inc.*, 387 F. App'x 548, 556 (6th Cir. 2010) (quoting 29 U.S.C. § 2611(11)).[3]

---

[2] The Court is not persuaded by DeVore's reliance on *Wallace*, a case in which the employee, Wallace, had multiple conversations with her employer, FedEx, about possibly taking medical leave and had been provided with FMLA paperwork for taking said leave. 764 F.3d at 575-79. Moreover, Wallace had submitted to FedEx a letter from her physician recommending "that [Wallace] be off work for two weeks due to her medical conditions" and "[s]he will then be reassessed." *Id.* at 577. On appeal, the Sixth Circuit upheld the jury verdict on the issue of notice, stating that, Wallace had provided evidence that would allow "a reasonable juror could conclude that Wallace had provided FedEx with sufficient notice" and that, based on the wording of the doctor's letter, "the jury was not unreasonable in concluding that Wallace requested leave that extended to her absences" past the first two weeks. *Id.* at 587. It was in this context that the court stated, "[t]he relevant question is whether Wallace provided FedEx with notice that she needed FMLA leave, not whether she provided notice that she needed a certain amount of FMLA leave." *Id.* at 586. Unlike the employee in Wallace, DeVore did not provide UPS with any information regarding the timing or duration of his potential medical leave.

[3] DeVore essentially argues that the seriousness of his health condition should be self-evident from the fact that he needed surgery and that he had required "significant time to recuperate" from similar procedures in the past. DN 62, PageID# 386. Yet, DeVore's bare statement to Johnston did not indicate the nature of the surgery and nothing in the record shows that UPS should have been charged with the knowledge that DeVore had continuing problems related to his past surgeries. *See Gipson v. Vought Aircraft Indus., Inc.*, 387 F. App'x 548, 556 (6th Cir. 2010) (rejecting the plaintiff's argument that the employer should have been on notice of the plaintiff's serious health condition based on leave taken for surgeries in the past) (citations omitted); *see also Brenneman v. MedCentral Health Sys.*, 366 F.3d

Accordingly, UPS has shown that DeVore failed provide UPS with adequate notice as required under the FMLA regulations and DeVore has not provided evidence to suggest otherwise. Thus, even if DeVore would have been entitled to take FMLA leave for the surgery he referenced, there is no basis for a reasonable trier of fact to conclude that his request for this leave was proper or that UPS was aware that he had made such a request. DeVore's prima facie case is, therefore, defective.

### B. Causation

Supposing, *arguendo*, DeVore provided proper notice and UPS understood that DeVore was exercising his FMLA rights, DeVore's prima facie case still fails for want of causation. To establish a causal nexus between an employee's protected activity and an employer's adverse employment action, DeVore must produce sufficient evidence "from which an inference could be drawn that the adverse action would not have been taken had [DeVore] not" engaged in a protected activity. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). The Sixth Circuit "has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (citations omitted).

However, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Tuttle v. Baptist Health Med. Grp., Inc.*, 379 F. Supp. 3d 622, 639 (E.D. Ky. 2019) (quoting *Montell v. Diversified Clinical*

---

412, 424 n.9 (6th Cir. 2004) (rejecting argument that, because "defendant knew the plaintiff has diabetes and that plaintiff had FMLA-qualifying, diabetes-related absences [in the past]," a material issue of fact existed as to whether employer had sufficient notice that later absence was also diabetes-related, where plaintiff stated only that he "wasn't doing well" that day).

7

*Servs.*, 757 F.3d 497, 504 (6th Cir. 2014) (internal quotation marks omitted)). While there is no bright line defining "close" temporal proximity, causation has been inferred up to "just shy of the ten-week mark" between an employer learning of an employee's protected activity and an adverse employment action. *Stein v. Atlas Indus.*, 730 Fed. App'x 313, 319 (6th Cir. 2018).

Nonetheless, in many circumstances, close temporal proximity alone is inadequate to establish causation.[4] First, several other courts in this district have followed the Eighth Circuit and found that "[e]vidence that the employer had been concerned about a problem before the employee engaged in protected activity undercuts the significance of the temporal proximity." *Noel v. MacArthur Corp.*, No. 19-10244, 2020 U.S. Dist. LEXIS 112208, at *45 (E.D. Mich. June 26, 2020) (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002)); *see also*, *e.g.*, *Zhu v. Vanderbilt Univ.*, No. 3:06-0460, 2007 U.S. Dist. LEXIS 75167, at *42 (M.D. Tenn. Oct. 4, 2007) *Matheson v. USF Holland Inc.*, No. 1:05cv593, 2007 U.S. Dist. LEXIS 7040, at *20 (S.D. Ohio Jan. 31, 2007).

Second, if an "intervening reason" for taking action against the employee arises between the time of the employee's protected activity and the time of the employer's adverse action, temporal proximity by itself will not be sufficient for establishing a causal connection. *See, e.g., Kuhn v. Washtenaw County*, 709 F.3d 612, 628 (6th Cir. 2013) (upholding dismissal of the plaintiff's claim of retaliation because the plaintiff's "extended discretionary leave and . . . failure

---

[4] The Sixth Circuit has, in some cases, found a causal connection on the basis of temporal proximity alone when the "'adverse employment action occurs very close in time after an employer learns of a protected activity.'" *Hamilton*, 556 F.3d at 435 (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). However, the court has "rarely found a retaliatory motive based only on temporal proximity." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010). *See also Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 471-72 (6th Cir. 2012) ("[W]e have repeatedly cautioned against inferring causation based on temporal proximity alone.").

8

to return to work" after he made a complaint gave rise to "an intervening reason" to terminate the plaintiff's employment).

Here, to show causation, DeVore relies completely on the fact that he was discharged two months after his "request" for FMLA leave. DN 62, PageID# 390. Assuming the temporal proximity between DeVore's statement to Johnston and DeVore's discharge was close enough to raise an inference of retaliation, this inference is dispelled by UPS' concerns about DeVore's conduct before and after his statement to Johnston. Between August 2013 and February 2018, UPS documented twenty-five separate disciplinary actions taken against DeVore. DN 54-10, PageID# 276-77. Of note, in November 2017, DeVore was disciplined for allowing a captain to make schedule and pay changes in violation of the CBA. *Id.*, PageID# 277; DN 54-11, PageID# 278. A May 23 email thread between Deignan, Johnston, and UPS Manager Rob Buchanan ("Buchanan"), after Deignan discovered DeVore's failure to enter an early release code on May 19, also suggests that DeVore had been counseled for similar conduct in the past. DN 54-15, PageID# 289. In this email, Deignan stated, "He has been told many of times not to do these types of things." *Id.*; *see also* DN 54-13, PageID# 282 ("There was also a recent situation on November 29th, 2017 where [DeVore] was warned to follow the contractual rules concerning a reserve assignment."). Thus, UPS has shown that it had concerns about DeVore engaging in the very same conduct for which he was discharged prior to his alleged statement to Johnston. Moreover, DeVore's conduct on May 19—approximately two months after he allegedly made the statement to Johnston—constitutes an "intervening reason" for his discharge.

There is, then, sufficient evidence in the record to mitigate the significance of the temporal proximity of DeVore's alleged protected activity and the adverse employment action taken against him. As DeVore offers no other evidence linking his discharge to his purported statement to

9

Johnston, he has failed to show that a genuine issue of material fact exists on this issue and has not shown a prima facie case of retaliation.

### C. Legitimate, Non-Retaliatory Reason for DeVore's Discharge

Finally, even if DeVore could prove a prima facie case, DeVore's claim cannot survive summary judgment because he has not offered the evidence necessary to overcome the legitimate, non-retaliatory reason UPS cites for his termination. DeVore must show that the proffered justification for his discharge was pretextual. *Kline v. TVA*, 128 F.3d 337, 342 (6th Cir. 1997) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). This means, to avoid summary judgment, DeVore must present evidence from which a reasonable jury could find that his conduct on May 19 was not the real reason that UPS terminated him, and that, in fact, his discharge was motivated by unlawful retaliation. *EEOC v. Ford*, 782 F.3d 753, 767 (6th Cir. 2015) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). He may meet this burden "by showing that UPS' proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Casagrande v. OhioHealth Corp.*, 666 F. App'x 491, 500 (6th Cir. 2016) (citation and quotation marks omitted).

#### 1. Basis in Fact and Honest Belief

UPS maintains that the decision to terminate DeVore's employment was because DeVore's conduct was intentional and, hence, in violation of the UPS Integrity Policy. DN 54, PageID# 193, 201, 202. DeVore claims that he does not challenge the factual basis behind UPS' proffered reason for his termination. DN 62, PageID# 396. However, this is not true. DeVore insists that he did not violate the UPS Integrity Policy because his decision not to enter the release code was the result of a "good faith mistake" made while working under pressure. DN 62, PageID# 393-395. Therefore, DeVore does contest the factual basis for his discharge.

10

UPS has provided evidence to support the factual basis behind its proffered reason for discharging DeVore. The conversation between DeVore and the pilot on May 19, 2018 reveals that DeVore's failure to input the release code was not due to a clerical error or inadvertent mistake, but was, in fact, the result of a conscious decision:

> DeVore: Anchorage MD11 crew scheduling, this is Rick.
> Pilot: Yes. Hello, Rick. This is First Officer Lukas up in Anchorage.
> …
> DeVore: 4857. Okay. Go Ahead.
> Pilot: Yeah. I was wondering if I could request a six-hour early release today.
> DeVore: How about we just don't worry about it and you go? Do you want to do that or --
> Pilot: (Indiscernible).
> DeVore: That way you don't lose any pay or anything?
> Pilot: Well, if that's – if that's all right with you guys, (indiscernible).
> DeVore: It – well, it's – it's with me. You're fine.
> Pilot: Awesome.

DN 54-14, PageID# 286.

Though DeVore maintains that he made this decision based on his mistaken understanding of the version of the CBA that was in effect in May 2018 (DN 62, PageID# 379), he admits that he was trained on the CBA that was operational at that time and the record reveals that, as a "higher grade" Scheduler, DeVore was considered an "expert in the contract" who was expected to "know explicitly what the contract states." DN 54-7, PageID# 249. And, as previously discussed, there is evidence that DeVore had been counseled for similar behavior prior to this incident. DN 54-1, PageID# 215-17; DN 54-15, PageID# 289.

It was in this context that two members of UPS management, Buchanan and Lauren Miller ("Miller"), called DeVore into Buchanan's office on May 23 and confronted him with the audio recording of the conversation. May 24 email, DN 54-13, PageID# 282. Buchanan reported that DeVore "immediately stated he knew this was wrong, that it was a bad judgment call on his part

and that he was very sorry." *Id.* Miller and Buchanan expressed to DeVore the seriousness of his conduct and asked him to write up a summary of the incident, then advised him to go home and not discuss the incident until it was "fully reviewed." *Id.* Emails were then exchanged between members of UPS management and DeVore's situation was discussed. DN 54-13, PageID# 281-84; DN 54-15, PageID# 289. DeVore returned to work two days later, at which point Johnston and Miller discharged DeVore for falsifying documentation. DN 54-1, PageID# 218. In sum, UPS has evidenced that the decision to terminate DeVore's employment was reasonably considered and informed by the circumstances.

Even if a question of fact remains as to whether DeVore's conduct constituted a mistake or an intentional violation of UPS Integrity Policy, an employer can defeat an attack on the factual basis for a challenged termination "by explaining that it had an honest belief in the reason it gave for the termination." *Hartman v. Dow Chem. Co.*, 657 F. App'x 448, 452 (6th Cir. 2016) (citing *Seeger*, 681 F.3d at 285); *see also Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) ("This court has adopted an 'honest belief' rule with regard to an employer's proffered reason for discharging an employee." (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)). UPS asserts that the decision to discharge DeVore was "based on an honest belief that DeVore had violated UPS' Integrity policy and intentionally failed to enforce the CBA." DN 54, PageID# 205. At a minimum, UPS has demonstrated that it was reasonable to believe that DeVore's failure to enter the release code was not merely a "good faith mistake" and that they acted on this basis.

In trying to undermine UPS' proffered reason for his firing, DeVore offers statements from other UPS employees who speculate that, in their opinion, UPS' stated reason for DeVore's termination could not be the "real reason" he was fired. DNs 62-7 and 62-8. He introduces

affidavits and testimony from other UPS employees, attesting to his competency and reliability, and he downplays the magnitude of his conduct on May 19, reducing it to its mere monetary cost to UPS. DNs 62-2, 62-3, and 62-4; DN 62, PageID# 397. However, to "discredit" UPS, DeVore "must do more than just disagree with a fact that led to [his] termination." *Hartman*, 657 F. App'x at 453 (citations omitted). Rather, he "must focus on the investigatory process and the resulting decision[,] . . . [which] requires a specific showing that the employer's decision-making process was not 'reasonably informed and considered' and is thus not worthy of belief." *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807-08 (6th Cir. 1998)) (internal citation omitted).

The closest that DeVore comes to challenging "the investigatory process" or "the resulting decision" is pointing to internal email correspondence from May 23 in which several UPS employees, including some members of management, lament having to pay the pilot who was released early by DeVore on May 19. DN 62-10. Looking at the record, it appears that a "Cissy Skeeters" stated, "I've always thought it was unfortunate that we have to pay in situations where someone made a mistake/promised something in error" and an unidentified individual stated, "Cissy said this particular guy is paid $46.06 per hour, so this mistake cost us $96.12." *Id.* Highlighting the use of the terms "error" and "mistake," DeVore claims that "[n]one of these communications suggest UPS employees believed Mr. DeVore acted dishonestly or that the mistake raised integrity issues." DN 62, PageID# 380.

There is no evidence that the individuals who refer to DeVore's conduct as "mistake" or "error" were in a position of authority over DeVore, had been fully apprised of the circumstances surrounding the situation, or had listened to the audio of the May 19 conversation. Furthermore, the entire focus of this email thread was on whether UPS was "on the hook" for paying the pilot who DeVore released early and not on the nature of DeVore's conduct. The internal emails that

13

do focus on DeVore's conduct clearly show that, as soon as the May 19 conversation was discovered, members of UPS management who were well-informed about the situation and had authority over DeVore were concerned about DeVore's integrity. *See* DN 54-13, PageID# 282; DN 54-15, PageID# 289.

The Court thus finds that DeVore has not raised a genuine issue of material fact as to the factual basis behind UPS' proffered reason for his discharge. At the very least, UPS has provided evidence that it acted with the honest belief that DeVore had violated UPS Integrity Policy when UPS terminated DeVore's employment in May 2018. For that reason, DeVore has failed to show pretext on these grounds.

*2. Motivation for Discharge*

According to DeVore, "there is evidence that could lead a reasonable juror to conclude the entry of a code issue did not actually motivate [his] termination." DN 62, PageID# 394. To evidence that a termination of employment was not motivated by the employer's proffered reason, a plaintiff must "'indict the credibility of the employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the employer,' and ultimately show that it is 'more likely than not' that the employer's proffered reason is pretext." *Williams v. Graphic Packaging Int'l, Inc.*, 790 F. App'x 745, 752 (6th Cir. 2019) (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004)).

As previously discussed, DeVore has failed to undermine the factual basis behind UPS' proffered reason for his termination and UPS, at minimum, has shown that it acted with the honest belief that DeVore violated the UPS Integrity Policy. Therefore, to show pretext under the theory that UPS' proffered reason was not UPS' actual motivation, DeVore must show that UPS' belief

14

that he had violated the UPS Integrity Policy was "more likely than not" not the actual reason for his termination and that the real reason was "more likely than not" illegal.

DeVore's entire claim hinges on the argument that UPS was illegally motivated to discharge him because he requested FMLA leave. Yet, other than the temporal proximity between his statement to Johnston and his discharge, DeVore has provided no evidence to suggest that his potential medical leave had anything to do with UPS' decision to terminate his employment. "[T]emporal proximity between [a plaintiff's protected activity] and [an employer's] decision to terminate [employment] cannot alone prove pretext." *Asmo v. Keane, Inc.*, 471 F.3d 588, 598 (6th Cir. 2006); *see also Fuller v. Mich. DOT*, 580 F. App'x 416, 428 (6th Cir. 2014) (indicating "temporal proximity alone is insufficient to create" a dispute of material fact as to whether an employer's stated reason was pretextual). Consequently, even if DeVore had offered sufficient evidence to call UPS' proffered reason into question, DeVore does not come close to showing that the "real reason" for his discharge was "more likely than not" illegal.

### 3. Insufficient Basis for Termination

To substantiate a claim that an employee's offending conduct was insufficient to warrant a discharge of employment, the employee has to provide evidence that "other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff[.]" *Williams*, 790 F. App'x at 753. Those other employees must be "'similarly situated' to [the plaintiff], meaning that they had the same supervisor, were governed by the same standards of conduct, and had committed the same [policy] violations as [the plaintiff], without any 'differentiating or mitigating circumstances' that would merit different treatment." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 398 (6th Cir. 2017) (quoting *Smith v. Leggett Wire Co.*,

220 F.3d 752, 762 (6th Cir. 2000)). Moreover, to avoid summary judgment, the plaintiff must "establish that those other employees . . . committed errors with the same 'severity and frequency'" as DeVore. *Williams*, 790 F. App'x at 753 (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001)).

DeVore argues:

> [G]iven Defendant's inability to produce a single other instance of an individual being terminated for the same or substantially similar conduct as it claims motivated Mr. DeVore's termination, a reasonable juror could conclude that UPS' stated reason for terminating Mr. DeVore was insufficient to warrant termination. Ms. Putt's testimony—that terminations at UPS usually involve harassment, fighting, or chronic attendance problems—provides more evidence that would permit a reasonable juror to conclude termination was unwarranted here.

DN 62, PageID# 395-96. The Court first notes that UPS need not make any showing of an employee "being terminated for the same or substantially similar conduct as it claims motivated [DeVore's] termination." It is DeVore who bears the evidentiary burden at this stage. To this end, DeVore offers testimony and sworn statements from various UPS employees who claim to have no recollection of any Scheduler being terminated "for the exact or even a similar mistake" as DeVore. *See* DN 62, PageID# 380-81 (citing DNs 62-4, 62-5, 62-8, and 62-12). He also compares his situation to that of other Schedulers at UPS who claim to have erroneously input, or failed to input, release codes or other information. DN 62-5, PageID# 466, 468-70; DN 62-3, PageID# 444.

DeVore's arguments miss the mark, as he attempts to compare his situation to other employees who allegedly made, or failed to make, release code entries by *mistake*. To reiterate, UPS has evidenced, at minimum, that it had a reasonable belief that DeVore had violated the UPS Integrity Policy. Thus, to show pretext, DeVore must offer proof that such a violation was insufficient to warrant his discharge. The bottom line is DeVore puts forth no evidence that UPS

16

decided not to discharge a similarly situated employee despite having an honest belief that the employee had violated the UPS Integrity Policy or committed another "substantially similar" act.[5,6] Hence, DeVore has not raised a genuine issue of material fact as to whether UPS' proffered reason for his termination was insufficient.

For all the reasons cited in this opinion, the Court finds that DeVore lacks the evidence to support a prima facie case of retaliation or to overcome UPS' legitimate, non-retaliatory reason for his discharge. Accordingly, the record taken in its entirety could not convince a rational trier of fact to return a verdict in DeVore's favor and UPS is entitled to summary judgment as a matter of law. The motion of UPS for summary judgment will be granted in a separate order.

June 27, 2022

Charles R. Simpson III, Senior Judge
United States District Court

---

[5] Despite Joe Lynott's sworn statement that he had "done what [DeVore] did many, many times without some [*sic*] much as a blink-of-the-eye from UPS management," Lynott only worked at UPS until 2015 and, hence, was never subject to the provisions of the 2016 CBA. DN 62-8, PageID# 478-79. Thus, Lynott was not "similarly situated" to DeVore.

[6] The Court also finds the testimony of Caesha Putt does not advance DeVore's claim. Based on her experience as a human resources manager for UPS, Putt indicated that attendance, harassment, and fighting could be grounds for termination. DN 62-12, PageID# 491-92. She also stated that she did not recall if she had heard of an employee being fired for "making one mistake in the performance of their job duties." *Id.*, PageID# 492. In claiming that Putt testified "that terminations at UPS usually involve harassment, fighting, or chronic attendance problems," DeVore unreasonably characterizes Putt's statements.